IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 26, 2024 Session

**IN RE BENTLEY E.**

**Appeal from the Chancery Court for Obion County**
**No. 35-195   W. Michael Maloan, Chancellor**

_____

**No. W2023-00846-COA-R3-PT**

_____

This is a termination of parental rights and adoption case.  Appellant/Father appeals the trial court's termination of his parental rights on the ground of abandonment by failure to provide more than token support and failure to exercise more than token visitation.  Father also appeals the trial court's determination that termination of his parental rights is in the child's best interest.  Because Father met his burden to show that his failure to provide support and to visit was not willful, we reverse the trial court's order terminating his parental rights and granting Appellees' petition for adoption.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of Chancery Court**
**Reversed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN, J., joined. J. STEVEN STAFFORD, P.J., W.S., filed a separate dissenting opinion.

Randy N. Chism, Union City, Tennessee, for the appellant, Todd E.[1]

David L. Hamblin, Union City, Tennessee, for the appellees, Brittany B., and Colby B.

**OPINION**

**I. Background**

Appellant Todd E. ("Father") and Brittany B.  ("Mother"), who were never married, are the parents of Bentley E. (the "Child"), who was born in December 2019.  Mother and Father lived together until the Child was approximately one year old.  In January 2022,

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

Mother married Colby B. ("Stepfather," and together with Mother, "Appellees"). In his brief, Father asserts that from "December 2020 through May of 2021, [he] was able to see the child regularly and have brief visitation when he requested the same from Mother." However, when Mother moved in with Stepfather in May 2021, Father asserts that his "visitation with the minor child was severely limited." Father states that, "[i]n December of 2021, Mother moved out of the house with Stepfather and moved in with her mother for a time. Father was able to visit the child during that period of time and spent a significant amount of time with the [C]hild." Concerning support, Father asserts that,

> [f]rom May of 2021 until March of 2022, Father would see the child when Mother called him and needed help with expenses. Mother would bring the child to where Father was working, Father would see the child in the car, and he would give Mother $40-$80 per time. He would also buy her big boxes of diapers. The last time that Mother requested money or diapers from him was in March of 2022. He gave her $40 and diapers, and Mother allowed him to spend forty-five (45) minutes with the child in a parking lot. During 2021 through March of 2022, Father believes that he gave Mother approximately $1,000.00 in cash and even more in diapers and wipes to assist with taking care of the child.

On May 26, 2021, Father filed a petition to establish paternity and to set visitation and child support. Mother answered the petition and requested that the Father be required to submit to a drug test. By order of May 16, 2022, the trial court ordered Father to submit to a ten (10) panel drug test before any visitation could be set. Father did not comply with the order until October 10, 2022, when he submitted to drug testing, which was positive for marijuana.

On September 19, 2022, Appellees filed a petition to terminate Father's parental rights and for Stepfather to adopt the Child. Father filed an answer in opposition to Appellees' petition, wherein he asserted that any failure to visit or support the Child was not willful because (1) Mother had precluded his visitation, and (2) he had sought to establish paternity and child support. The trial court heard the case on February 28, 2023. By order of May 11, 2023, the trial court terminated Father's parental rights on the ground of abandonment by failure to provide more than token support and failure to exercise more than token visitation. The trial court also granted Appellees' petition for adoption and changed the Child's surname to that of Stepfather. Father filed a timely notice of appeal on June 9, 2023.

On October 2, 2023, Father filed a Tennessee Rule of Civil Procedure 60.02 motion to set aside the May 11, 2023 order. Therein, Father asserted that Appellees were separated and contemplating divorce. Father averred that Appellees misrepresented the state of their relationship during the February 2023 trial. Appellees filed a response, admitting that they were separated but denying any misrepresentation. By order of April 5, 2024, the trial

- 2 -

court denied Father's Rule 60 motion, finding that the Appellees made no misrepresentations at the hearing. In his statement of the issues, Father does not raise a specific issue regarding the denial of his Rule 60 motion, and we will not address that ruling. *In re Kaliyah S.*, 455 S.W.3d 533, 557 (Tenn. 2015) (stating that the failure to raise an issue on appeal results in its waiver).

## II. Issues

There are two dispositive issues:

1. Whether there is clear and convincing evidence to support at least one of the grounds relied upon by the trial court to terminate Father's parental rights.

2. If so, whether there is clear and convincing evidence to support the trial court's finding that termination of Father's parental rights is in the Child's best interest.

## III. Standard of Review

It is well settled that:

A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clause of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted).

Termination of parental rights proceedings are governed by statute in Tennessee, *In re Kaliyah S.*, 455 S.W.3d at 541, and the statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos.

M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))) (internal quotation marks omitted).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights. It provides, in pertinent part:

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c). Therefore, every termination of parental rights case requires the trial court "to determine whether the parent has engaged in a course of action or inaction that constitutes one of the statutory grounds for termination[,]" and whether termination of the parent's rights is in the child's best interest. *In re Donna E.W.*, No. M2013-02856-COA-R3-PT, 2014 WL 2918107, at *2 (Tenn. Ct. App. June 24, 2014). "Because the stakes are so profoundly high[ ]" in a termination of parental rights case, the statute "requires persons seeking to terminate a . . . parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). This Court has observed that "[t]his heightened burden of proof minimizes the risk of erroneous decisions." *Id.* (citations omitted).

If the trial court determines that clear and convincing evidence supports grounds for termination, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d at 555. The party petitioning for the termination of parental rights bears the burden of demonstrating that termination is in the best interest of the child by clear and convincing evidence. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010).

We review the trial court's findings of fact *de novo* on the record with a presumption of correctness. Tenn. R. App. P. 3; *In re Carrington H.*, 483 S.W.3d at 524 (citations omitted). However, "[i]n light of the heightened burden of proof in termination proceedings . . . [we] must make [our] own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citation omitted). However, when the trial court has seen and heard witnesses, we give great deference to any findings that are based on the court's assessment of witness credibility. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct.

App. 2007) (citation omitted). We will not reverse a finding based on witness credibility unless the record contains clear and convincing evidence to contradict it. *Id.* A trial court's conclusion that clear and convincing evidence supports termination of parental rights is a conclusion of law that we review *de novo* with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524 (citation omitted). "This standard of review is consistent with the standard of review for mixed questions of law and fact." *In re Taylor B.W.*, 397 S.W.3d 105, 112-113 (Tenn. 2013) (citing *Starr v. Hill,* 353 S.W.3d 478, 481–82 (Tenn. 2011) ("Although a presumption of correctness attaches to the trial court's findings of fact, we are not bound by the trial court's determination of the legal effect of its factual findings[.]").

## IV. Grounds for Termination of Father's Parental Rights

The trial court terminated Father's parental rights on the ground of abandonment by both failure to visit and failure to support. Tenn. Code Ann. § 36-1-113(g)(1). Although only one ground must be proven by clear and convincing evidence, the Tennessee Supreme Court has held that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 511. Accordingly, we will review the trial court's findings as to both abandonment by failure to support and abandonment by failure to visit.

Tennessee Code Annotated section 36-1-102(1)(A) defines the ground of abandonment as follows:

(i)     For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. §§ 36-1-102(1)(A)(i). The statute further provides that a failure to visit consists of "the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is defined as visitation that, "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C). Similarly, a failure to support involves "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. §

36-1-102(1)(D). When the provided support, "under the circumstances of the individual case, is insignificant given the parent's means[,]" it is considered token. Tenn. Code Ann. § 36-1-102(1)(B). The parent's abandonment within the relevant four-month period may not be rectified by resuming visitation or support subsequent to the filing of a termination petition. Tenn. Code Ann. § 36-1-102(1)(F).

A parent may raise as an affirmative defense that the failure to perform more than token visitation or provide more than token support was not willful. Tenn. Code Ann. § 36-1-102(1)(I). As noted above, in his answer, Father asserts that any failure to visit or support was not willful. As such, Father bears the burden of proving the absence of willfulness by a preponderance of the evidence. *Id*. Willfulness in terms of parental rights "does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will." *In re Audrey S.*, 182 S.W.3d at 863. (citations omitted). Instead, "a person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id*. at 863-64.

In its order terminating Father's parental rights, the trial court held:

> The Court finds by clear and convincing evidence that pursuant to T.C.A. § 36-1-113 (g), Mr. Eaves has abandoned the minor child as defined in T.C.A. § 36-1-102 (1) (A) (i) as he has failed to visit the minor child during the four (4) months preceding the filing of the adoption and has failed to pay child support during the four (4) month preceding the filing of the adoption. The Court further finds that any visitation or any support paid by Mr. Eaves would be token support as defined in T.C.A. § 36-1-102 (1) (B) (C).

In support of its holding, the trial court made the following, relevant factual findings:

> 2. [Father] filed a petition to establish paternity and set visitation and child support . . . on May 26, 2021. The parties agreed at trial that [Father's] attorney died unexpectedly on November 18, 2021.
> 3. . . . An order was entered on May 16, 2022, requiring the [F]ather to submit to a ten (10) panel drug test before any visitation could be set in that case.
> 4. The [F]ather waited until October 10, 2022, to take the drug test . . . .
> 5. The Father had only brief times of visitation with the minor [C]hild between December 2021 and July 2022 and no visitation after July 2022.
> 6. . . . The Court further finds that when the [M]other separated from the [F]ather the [F]ather rarely visited and had no overnight visitation with the [C]hild after she left the [F]ather's home in December 2020. The [F]ather never paid child support after the parties separated in 2020. However, the [M]other and [F]ather resided together for two weeks in December of 2021.

*\*\*\**

10. The Court finds that [Father] gave a nominal amount of money to [Mother] in 2021 by buying diapers and giving small amounts of cash when the [M]other requested during 2021 and 2022.

Concerning Father's failure to visit, it appears that, after she and Father separated, Mother unilaterally decided when Father could and could not see the Child. For example, Mother testified:

Q. And after [Mother and Father] separated, split up in December of '21 there was—there were times between then and the next three or four months that [Father] would see Bentley some with you, maybe not for a long period of time, maybe not overnight, but he still saw his son during that period of time, correct?

A. Few times.

Q. Okay.

A. Was never alone. It was always with me.

Q. You didn't want [Father] to have [the Child] alone; did you?

\*\*\*

A. No.

Q. Okay. And you told people that [Father] can't have [the Child], correct?

A. Because of the drug use, yes.

Q. You said [Father] can't see [the Child], correct?

A. I never said [Father] couldn't see [the Child].

Q. Okay. Did you let [Father] see [the Child] over at [Father's] mother's house?

A. No.

Q. Did you let [Father] see [the Child] over at [Father's] father's house?

A. I told him I would meet over there.

In December 2021, Mother and Stepfather separated for approximately two months. During this separation, Mother testified that she "let [Father] spend time with [the Child]." Later in her testimony, Mother conceded that Father "[h]ad reached out . . . to visit the [C]hild." When asked whether she denied Father visits, Mother stated that she did on "days that I couldn't. Like I was at work or something." Mother conceded that before he was ordered to take a drug test, Father "contacted [Mother] indicating that he want[ed] a relationship with the [C]hild."

Father testified that he saw the Child quite often until Mother and Stepfather started their relationship. Thereafter, Father stated that he "really didn't get a lot of visitations" until Mother and Stepfather separated in December 2021. During that brief separation, Father stated that Mother allowed him to see the Child, but Mother "wouldn't let [Father]" have overnight visits. This led Father to file his May 2021 petition to establish paternity and to set visitation and child support. When asked why he filed the petition, Father testified that he "was trying to get visitation . . . [b]ecause . . . [he] was tired of [Mother] . . . [t]elling me when I can and when I couldn't see [the Child]." Father recounted how his attorney unexpectedly died in November of 2021, and how Father hired another attorney within approximately one month of this event. Father testified that Mother attempted to get him to voluntarily relinquish his parental rights and offered him "$3,000 to sign the rights away [to] my son." Father stated that he never "stop[ped] asking to see [the Child]" and continued to text Mother until "two or three weeks before [Appellees filed their petition] still trying to see my son."

The Child's paternal grandfather's testimony largely corroborates Father's account of seeking visitation only to be denied by Mother. Specifically, grandfather testified:

Q. Did [Father] ask for additional visitation?
A. He did.

***

Q. What did [Mother] say?
A. Said she didn't trust [Father] being alone with the [C]hild.
Q. Okay. Have you heard any other times that [Father] has . . . requested visitation with [the Child]?
A. I have. [Father has] come to my house in tears a couple of times stating that [Mother] won't let him see [the Child]. I've heard her on the phone as well stating, I don't trust you being with [the Child] by yourself, and I don't want him being around your mother [*i.e.*, the Child's paternal grandmother].
Q. If he was on the phone, how did you hear the conversation?
A. Speaker.

Grandfather further testified that he and his wife "even tried to mediate" by offering to facilitate Father's visitation at their house. Mother stated that "she'd think about it," but the visits never occurred. Grandfather's wife corroborated that Mother "didn't take us up on the offer [to facilitate visits]."

As noted above, a parent's failure to visit is deemed willful when it is the product of free will rather than coercion. *In re M.L.P.*, 281 S.W.3d at 392 (citing **In re Audrey S.**, 182 S.W.3d at 863). Accordingly, if a parent attempts to visit a child but is thwarted by the acts of others, the failure to visit is not willful. *Id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). However, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *Id*. at 393. Also, "[w]hen analyzing willfulness, courts have considered whether a parent who was allegedly denied visitation redirected their efforts to the courts in an attempt to secure visitation." *In re Heaven J.*, No. W2016-00782-COA-R3-PT, 2016 WL 7421381, at *5 (Tenn. Ct. App. Dec. 22, 2016). For instance, in *In re Adoption of A.M.H.*, 215 S.W.3d at 796, the Tennessee Supreme Court held that the parents' failure to visit was not willful when "there was animosity between the parties and [ ] the parents were actively pursuing custody of [the child] through legal proceedings during the four-month period[.]" The same is true here. From the record, Father had access to the Child until Mother and Stepfather's relationship began in or around May 2021. At that point, Mother largely precluded Father from seeing the Child. When this occurred, Father did not delay seeking the help of the courts; he filed his petition to establish paternity (wherein he also sought visitation and the setting of child support) on May 26, 2021 (the same month Mother and Stepfather's relationship began). As evidenced by the foregoing testimony, while Father's petition was pending, Mother would not allow meaningful visits. Under these circumstances, it was error for the trial court to terminate Father's parental rights on the ground of abandonment by **willful** failure to visit. We reverse that holding.

Turning to the question of child support, Father's May 2021 petition sought both visitation and the setting of child support. Unfortunately, Father's attorney died unexpectedly before Father's petition was resolved. Although not ordered to pay a specific amount of child support, Father testified that he gave Mother money and necessities for the Child:

Q [to Father]. After you separated from [Mother], did you buy any supplies for Bentley?

A. Yes, sir. [Mother] would call and ask me for diapers or if she could pull up and get money . . . .

Q. Did [Mother] come by to see you when you were . . . at work?

A. Yes, sir, in 2021.

Q. Would you give her money?

A. Yes, sir, anywhere from [$]40 to $80 at a time.

Q. Did you buy diapers for her?

A. Yes, sir, big boxes.

Father further testified that he "called the child support office in Dresden to try to set myself up on child support, and they told me I couldn't due to this case [pending]." Moreover, although Father conceded that he has not given enough support, he testified that he has provided approximately $1,000,[2] to-wit:

Q [to Father]. . . . But total money, out of all the times since this kid has been born and y'all separated . . . how much money do you think you['ve] given [Mother]?

A. I've probably given her maybe a thousand dollars. And I realize that's not enough.

Q. A thousand dollars?

A. I realize that's not enough.

Q. That would be 40 or 80 at a time?

A. Yes, sir.

Clearly, this case has had a lot of delays, including the death of Father's attorney, Mother and Father's brief reconciliation in December 2021, and court delays caused by COVID. However, despite these issues, Father has maintained his desire for paternal responsibilities, including participation in the Child's life and the providing of support. As Father testified:

Q [to Father]. . . . You said when you [were] asked about child support, you said, I never had a problem with that?

A. Yes, sir.

---

[2] In her testimony, Mother does not dispute that Father gave her some money, but she disputes the $1,000 amount, claiming that Father's total support contribution was around $200.

Q. You did have a problem with it because you weren't paying it, true?

A. I wouldn't say it was true. I didn't have a problem with it, because I was ready to see my [C]hild. I was ready to pay child support if that's what had to be done for me to see my [C]hild.

Q. Okay. So which would come first, paying the child support or seeing the [C]hild?

A. Well, from my understanding from everything that I had been told by when [my attorney] was alive was that once I started paying child support, I was going to get my visitation. But the child support was never set by the Court, so I didn't know how much to pay.

From the record, this Court has no doubt that Father very much wants to be in this Child's life. Although, as he concedes, Father should have been more proactive in pursuing his petition, he never abandoned it. Father sought permission from Mother to be in the Child's life, but Mother largely refused. Father sought a court order to pay a set amount of support and even inquired at the child support office to establish this obligation, but, to date, the court has not heard the question of support. From our review, the evidence does not clearly and convincingly establish that Father abandoned this Child, although he has not consistently visited or supported him. In short, Father met his burden to show that any failure to visit or support was not willful. In view of this holding, we also reverse the trial court's grant of Appellees' petition for adoption and its decision changing the Child's surname. The issue of best interest is pretermitted as moot.

## V. Conclusion

For the foregoing reasons, the trial court's order is reversed, and the case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellees, Brittany B. and Colby B. Execution for costs may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE